**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   PHYLLIS ANN HILL,

                                     Chapter 7
                                     Case No. 04-30325 (RTL)

                 Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - -X

ANDREA DOBIN, TRUSTEE,                Adv. Pro. No. 05-01183 (RTL)

                 Plaintiff,

v.

DANIEL HILL,

                 Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**OPINION**

**APPEARANCES:**

**Jason S. Feinstein, Esq.**
**Andrea Dobin, Esq.**
Sterns & Weinroth, PC
Attorneys for Chapter 7 Trustee, Andrea Dobin

**James G. Aaron, Esq.**
Ansel Zaro Grimm & Aaron, PC
Attorneys for Defendant, Daniel Hill

**RAYMOND T. LYONS, U.S.B.J.**

In this adversary proceeding, the Chapter 7 Trustee, Andrea Dobin, seeks to avoid certain transfers pursuant to a property settlement agreement between the Debtor, Phyllis Hill, and her ex-husband, Daniel Hill, as part of their divorce proceeding. It is the Trustee's contention that the terms of the divorce settlement agreement were made disproportionately favorable to the non-debtor spouse in an attempt to keep the Debtor's assets from a looming judgment creditor.

This court finds the Debtor's transfer of her interest in certain marital assets as part of the divorce settlement was done with the intent to keep assets from a judgment creditor. Having found all the elements of a fraudulent transfer pursuant to 11 U.S.C. § 548 (a)(1)(A), the transfers may be avoided by the Trustee. The Trustee is entitled to recover the value of the property transferred pursuant to 11 U.S.C. § 550 (a)(1).

## JURISDICTION

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(H) (proceedings to determine, avoid, or recover fraudulent conveyances).

## FINDINGS OF FACT

### Divorce Proceedings

Phyllis Hill and Daniel Hill married on March 15, 1975. They had two children, both of whom were emancipated during the time relevant to this matter. Daniel has been an employee of the United

2

States Postal Service ("USPS") since before marriage until the present.  His current title is Manager of

Distribution, a management post exempt from the overtime rules of the wage and hour laws.  Phyllis

worked in the mortgage banking industry, eventually becoming licensed as a mortgage banker and

acquiring her own business.

Daniel and Phyllis had a stormy marriage.  They separated for about 18 months in the early

1990's.  Daniel moved out and filed a complaint for divorce.  He paid Phyllis for household expenses

while he was out of the house.  However, they reconciled, resumed cohabitation and the complaint was

withdrawn.  During the first twenty years of marriage they both worked and pooled their resources.

Daniel made more than Phyllis during most of the marriage.  Nevertheless, Phyllis requested, and Daniel

acquiesced, to keep separate financial accounts in 1995.  Thereafter Phyllis's income increased

dramatically after she acquired her own mortgage banking business.  Daniel's base salary is $75,000

per year and he predicts annual raises based upon increases in the cost of living.  For the last few years,

Daniel has earned extra income from USPS (as high as $103,000) by working extra hours due to the

closing of the USPS facility in Trenton following the discovery of anthrax.  That facility is expected to

reopen within a year, depriving Daniel of an opportunity to earn more.  In addition, Daniel makes about

$28,000 per year from his rental properties.  He has been able to contribute to a thrift savings plan at

work and take vacations in Las Vegas.

Phyllis is currently employed at a mortgage company affiliated with a nationally-known bank.

She receives a draw against commissions and earned $150,000 in 2003 and $89,000 in 2004.  While

she owned Paradise Mortgage, Phyllis's income was considerably higher.  From 1999 to 2001 she

averaged $230,000 in gross income on her Federal Income Tax returns.

3

The parties lived in a marital residence in Howell, New Jersey that they purchased together in November 1980.  After Phyllis started her own business, she transferred her interest in the Howell residence to Daniel by deed dated August 26, 1997, and recorded September 16, 1997.  She did this to protect the residence from potential creditors of her business.  Nevertheless, she continued to live in the house and to treat it as a jointly-owned asset.  On several occasions after the transfer, Daniel and Phyllis refinanced the mortgage on the residence and split the additional cash.  The Howell residence was appraised for the matrimonial case at $330,000 with a mortgage of $164,000 yielding a net equity of $166,000.

Daniel used his share of the refinancing proceeds to purchase two residential condominium apartments in Jackson, New Jersey: one (Jackson 1) acquired May 5, 1993, for $55,000 with a purchase money mortgage of $44,000, and the other (Jackson 2) acquired February 19, 1999, for $73,500 with a purchase money mortgage of $66,150.  Daniel made all of the mortgage payments on these condos, paid all the other expenses, and collected rent whenever a unit was rented.  Each of the couple's two daughters resided in one of the units from time to time.  Jackson 1 was appraised at $140,000 and Jackson 2 at $160,000.  Daniel paid off both mortgages before the divorce.

Phyllis purchased Paradise Mortgage Service Company in 1995.  She claims the business was highly successful, affording her substantial income and perquisites such as luxury cars and expensive restaurants.  One of their daughters worked in the business and Phyllis disclaimed detailed knowledge of the finances, claiming her daughter handled that aspect of the business.  Also, Phyllis bought and sold investment real estate as a sideline.

The couple permanently separated in December 1999, at which time Phyllis moved out of the

4

marital home.  Daniel has remained in the Howell residence and has paid all of the expenses himself

since Phyllis moved out.  She bought a residential condominium apartment in Manalapan, New Jersey

and moved in there.  In 2001, she also bought an apartment in Sunny Isle Beach, Florida.  Since their

separation each has supported himself or herself without assistance from the other.  Also, they have

filed separate income tax returns since 1999.

After being separated for some time, Phyllis met another man whom she intended to marry so

she filed a complaint for divorce on May 14, 2003, seeking equitable distribution as well as alimony.

Daniel filed an answer and counterclaim on July 1, 2003, also seeking equitable distribution, but not

seeking alimony.  Each party filed a Case Information Statement with the Family Court.  Phyllis's CIS

listed 5 items of real estate: the Howell residence as jointly owned, the Manalapan and Florida

properties owned by her, and the two Jackson condominiums owned by Daniel.  She also had two

retirement accounts for $50,000 and $86,000.  Daniel's CIS disclosed a retirement savings account of

$44,000.  He also owned a residence in Belleville, New Jersey gifted to him by his father in 1998 that

he rented to tenants.  Unmentioned by him, but well-known to the parties, Daniel stood to collect a

generous pension for his many years of service to the USPS.  The marital portion of Daniel's pension

was evaluated by an expert in the matrimonial case at $527,330.56.  This was for settlement,

immediate offset purposes.  If the matter proceeded to litigation and Phyllis were awarded part of

Daniel's pension as and when received, the expert would have to recalculate the value for purposes of

a Qualified Domestic Relations Order ("QDRO").

Daniel was convinced that Phyllis was concealing valuable assets. He was under the impression

that Phyllis had a valuable business and had accumulated publicly traded securities and other

5

investments that she was hiding from him.  Daniel had no evidence to back up his suspicions and,

though his matrimonial attorney made some informal discovery requests, Daniel was unwilling to incur

legal fees to press for formal discovery or investigation.[1]

Shortly after filing for divorce Phyllis sold her Manalapan residence to her daughter and leased

it back.  She netted $93,000 that she used to pay legal fees.  She was still living in that condo as of the

trial in bankruptcy court.

## Settlement

On November 10, 2003, Daniel made an offer to settle the matrimonial case.  Neither party

would get alimony or attorney's fees.  Daniel would keep his two condos as well as the Belleville

property received from his father and Phyllis would keep her Manalapan and Florida condos.  The

Howell residence would be sold with Daniel keeping half and setting up a trust for their two daughters

with the other half.[2]  Each party would keep his or her retirement benefits.  Phyllis's response to this

offer is not known, but the case did not settle.  The only evidence of Phyllis's settlement proposals was

a November 4, 2003 letter from her lawyer proposing a 50/50 split of Daniel's pension via a QDRO.

The parties were required to participate in an early settlement panel ("ESP") on December 15,

2003.  Prior thereto each side submitted a proposal to the panel.  Daniel proposed to waive alimony if

---

[1]  Just prior to the trial in bankruptcy court, the Trustee obtained and disclosed to Daniel a copy
of a check from Phyllis's business to one of his daughters for $101,000.00 that Daniel suggests might
indicate Phyllis's enlistment of her daughter in a scheme to hide assets from him (as well as the Trustee);
but this is speculation on his part.

[2]In evaluating Daniel's proposal, the court considers property to be gifted to the children as
being equitably distributed to Daniel.  The children have no right to equitable distribution and the
promise to put property in trust for them is wholly gratuitous.

6

the matter settled then; otherwise he demanded $150 per week.  His proposed property distribution

was similar to his November settlement offer except he proposed keeping the Howell residence for

himself and giving the Jackson 1 condo to the daughters.  Phyllis proposed to the panel that the Howell

residence be sold and the proceeds be split as well as a split of the retirement accounts, including

Daniel's USPS pension.  She wanted the Manalapan, Florida and Jackson 1 condos for herself and

offered Daniel the Jackson 2 condo as well as his father's property in Belleville.  Phyllis proposed no

alimony nor attorney's fees.  The case did not settle, but both Phyllis and Daniel left with the

understanding that the panelists thought Phyllis should pay alimony to Daniel.  However, the panelists

also confirmed that Phyllis should expect to receive half of Daniel's USPS pension, as and when

received.

During that process, Phyllis made representations regarding substantial entitlements she

expected to receive from the stock sale of her company, discussed below.  The representations Phyllis

made at this time were misleading as an arbitration award had already been issued resolving those

matters against her.

Shortly after the ESP, Phyllis sold her condo in Florida and netted $152,000 in cash.  This was

the money she used to fund the settlement with Daniel described below.

No further progress seems to have been made on settlement of the matrimonial case.  Daniel's

lawyer threatened, "If this matter is not resolved and testimony is required, both judgment creditors and

taxing authorities could well end up involved."  A week later she subpoenaed Synergy Bank and sent a

copy to Phyllis's lawyer.  The next day on April 14, 2004, Phyllis made a settlement proposal to

Daniel. Two days later, on April 16, 2004, a judgment of divorce was filed and the property settlement

7

agreement was placed on the record.  The stipulation of settlement provided the following:

Alimony - Phyllis waived any claim for alimony.  Phyllis paid Daniel a tax-free lump sum of $150,000.00, whereby Daniel waived any right to seek future alimony.

Pension - Phyllis accepted a 33% interest in the marital portion of Daniel's pension, as and when received, rather than the 50% originally sought.

Howell (marital home) - Daniel received sole ownership of the marital home.  The parties further agreed the home would be sold in seven years, whereupon Daniel would received 50% of the sale proceeds and the remaining 50% of proceeds would be divided equally between the parties' two adult daughters.  (Phyllis originally sought a 50% interest in the home, but received no interest).

Jackson 1 (property purchased by Daniel during the marriage following refinance of the marital home) - Daniel received a 100% interest in this property.  (Phyllis originally sought 100% of this property).

Jackson 2 (property purchased by Daniel during the marriage following refinance of the marital home) - Daniel received a 100% interest in this property.  (Same as Phyllis's original proposal).

Belleville (property Daniel inherited) - Daniel received 100% interest in this property.

Manalapan (property purchased by Phyllis with her own funds after the parties separated) - Phyllis received a 100% interest in this property that she had sold to her daughter shortly after filing for divorce and used the proceeds to pay legal fees.

Florida (property purchased by Phyllis with her own funds after the parties separated) - Phyllis received a 100% interest in the net proceeds of the earlier sale of this property.  All but $2,000 of those funds were used to pay Daniel's alimony award.  (Daniel never sought an interest in this property).

8

In other words, Phyllis's offer was not only significantly more favorable to Daniel then her

proposal to the early settlement panel, it was significantly more favorable to Daniel then his own

proposal to the ESP.  The settlement proposal also contained the following language in reference to

Phyllis's judgment creditor (explained below):

> The Settlement Agreement would not be incorporated into
> the Judgment of Divorce but would be referenced to in the
> Judgment.  The Agreement would be confidential and the
> terms shall not be disclosed to any third party without the
> written consent of both parties.
>
> The Husband further agrees that he will not have any direct or
> indirect contact with Synergy Bank, its employees, agents,
> principals, subsidiaries, or affiliates.  The Husband shall not
> disclose any information he may possess to any party that
> might have an interest in the litigation between Synergy Bank
> and Ms. Hill.

After the stipulation was filed with the Superior Court, Phyllis's lawyer wrote, "I assume that you are

recalling your subpoenas, particularly the one to Synergy Bank . . . ."

In this trial in bankruptcy court the Trustee's matrimonial law expert, Cary Cheifetz, Esq.,

testified that the matrimonial settlement had no reasonable relationship to what the parties might have

anticipated if the matter were tried before the Family Court.  Mr. Cheifetz opined that there was no

expectation that Daniel, a 28-year employee of the postal service earning over $80,000 a year who had

supported himself for four years of separation and managed to acquire two investment properties and

inherited a third, would receive alimony.  Mr. Cheifetz further testified that in his opinion Phyllis would

be given half of Daniel's pension, as and when received, one half of the Howell residence, and half of

the Jackson 1 and Jackson 2 condominiums that had been acquired during marriage and prior to

9

separation, and seventy percent of the Manalapan and Florida condos that Phyllis acquired after the separation.  He allowed that Daniel would get credit for principal reductions on the mortgages between the date of separation and filing of the complaint for divorce, and that the lengthy separation might be factored into the equation.

Daniel's divorce lawyer testified that she felt Daniel would be entitled to alimony considering Phyllis's high income between 1995 and 2001.  She maintained that the $150,000 payment was a reasonable sum for a waiver of future alimony.  She did concede that Phyllis would likely have been awarded half of Daniel's pension if the matter were tried and could not explain why Phyllis would accept only one-third of the pension.

The following chart illustrates the various outcomes for Daniel, excluding his pension.

**Daniel's share of equitable distribution and alimony (In thousands of dollars)**

| Property | Phyllis's Proposal to ESP for Daniel | Cheifetz Expert Opinion Daniel's Share | 50/50 | Daniel's Proposal to ESP | Divorce Settlement Agreement |
|---|---|---|---|---|---|
| Alimony | 0 | 0 | 0 | 0 | 150 |
| Howell Residence net equity $166,000 | 83 | 83 | 83 | 166 | 166 |
| Jackson 1 value $140,000 | 0 | 70 | 70 | 140 | 140 |
| Jackson 2 value $160,000 | 160 | 80 | 80 | 160 | 160 |
| Florida proceeds $152,000 | 0 | 46 | 76 | 0 | 0 |
| Manalapan proceeds $93,000 | 0 | 28 | 46 | 0 | 0 |
| Wachovia $50,000 | 25 | 25 | 25 | 0 | 0 |
| Guardian $86,000 | 43 | 43 | 43 | 0 | 0 |
| Thrift Savings $44,000 | 22 | 22 | 22 | 44 | 44 |
| Totals | 333 | 397 | 445 | 510 | 660 |

**Debtor's Lawsuit with Synergy Bank**

Relevant to the proceeding in this court are the facts surrounding Phyllis's former business,

Paradise Mortgage Service Corp. ("Paradise Mortgage").  In or around 1995, Phyllis acquired

Paradise Mortgage and owned and operated it until September 7, 2001, when she entered into a stock

purchase agreement with Synergy Bank, S.S.B. ("Synergy"), selling 100% of her stock interest to Synergy.

Following the sale, Synergy notified Phyllis of a default under the stock purchase agreement. Accordingly, on March 28, 2002, Synergy filed a demand for arbitration against Phyllis. She counterclaimed for alleged unpaid commissions. An arbitration hearing was conducted before retired Judge Keefe, and on September 23, 2003, the arbitrator issued an award, finding Phyllis in breach of contract, as well as in breach of the covenant of good faith and fair dealing. Synergy was awarded $192,364.18, while Phyllis received a set-off in the amount of $38,325, for commissions owed. After factoring in the set-off and prejudgment interest, Synergy received a total award of $164,319.69. On December 18, 2003, Synergy obtained a judgment on the arbitration award against Phyllis.

On March 4, 2004, in an effort to collect on its judgment, Synergy served Phyllis with a subpoena for a deposition and to produce financial documents on March 24, 2004. Phyllis did not appear, and on March 29, 2004, Synergy filed a motion to enforce its rights. On April 19, 2004, Synergy obtained an order enforcing litigant's rights against Phyllis, wherein she was ordered to appear for a deposition and produce documents on May 11, 2004. Again, Phyllis did not appear. The court then entered an order compelling Phyllis's appearance for a deposition on June 17, 2004; failure to appear would have resulted in the issuance of an order for her arrest. Instead of appearing, Phyllis filed a Chapter 7 bankruptcy on June 16, 2004. She testified at a Rule 2004 examination that she had discussed bankruptcy with her matrimonial lawyer in early 2004. She figured she would file after she got a divorce, and that is what she did.

The following chart illustrates the coincidence of the matrimonial and business proceedings.

**Relevant Time-line**

| Year | Relevant Dates | Marriage and Divorce | Business |
|------|----------------|----------------------|----------|
| **1995** | | • After a period of separation, the parties reconciled but then began keeping separate financial accounts | • Phyllis purchased Paradise Mortgage Service Company |
| **1997** | • August 26th | • Phyllis transferred her interest in marital residence to husband | |
| **1999** | • December | • Parties permanently separated | |
| **2002** | • March 28th | | • Synergy filed a demand for arbitration against Phyllis |

13

| 2003 | • May 14th | • Phyllis filed a complaint for divorce<br>• Shortly after, Phyllis sold her Manalapan residence to her daughter and leased it back | |
| | • September 23rd | | • Arbitration hearing was conducted and an award was entered in favor of Synergy |
| | • November 7th | • Daniel's matrimonial lawyer sent him a letter that included a handwritten legend explaining Phyllis's liability to Synergy as a result of the arbitration | |
| | • November 10th | • Daniel made an offer to settle the matrimonial case | |
| | • December 15th | • Parties participated in Early Settlement Panel | |
| | • December 18th | | • Judgment was entered in favor of Synergy on the arbitration award in the amount of $164,319.69 |

| 2004 | | | |
|---|---|---|---|
| | • January | • Phyllis sold her Florida condo | |
| | • March 24th | | • Phyllis failed to appear for her deposition and to produce financial documents to Synergy |
| | • March 29th | | • Synergy filed a motion to enforce litigant's rights against Phyllis |
| | • April 14th | • Phyllis made an offer to settle the matrimonial case | |
| | • April 16th | • Judgment for divorce was filed and property settlement agreement placed on the record | |
| | • June 1st | | • Court entered order compelling Phyllis to appear for a deposition on June 17, 2004, by threat of arrest |
| | • June 16th | | • Phyllis filed bankruptcy |

Daniel and his matrimonial lawyer learned of Phyllis's plight with Synergy.  As early as November 1, 2003, Daniel's lawyer penned a note to him that Phyllis had lost her case against Synergy and owed $100,000 or more.  At depositions in the matrimonial case on February 12, 2004, attended by Phyllis and Daniel, his lawyer questioned Phyllis extensively about the arbitration and the fact that a large judgment had been entered.  Phyllis also confessed that she was considering bankruptcy.

Phyllis's overly-generous settlement proposal to Daniel was more than coincidental with

15

Synergy's vigorous collection efforts against her - it was driven by it. To paraphrase Phyllis's testimony at trial when asked why the divorce settlement called for proceeds from the Howell residence to go to the children, "If I couldn't keep it, I might as well let my daughters have it."

## DISCUSSION

The Trustee asserts she is entitled to avoid the terms of the divorce settlement, insofar as the distribution was inequitable to the Debtor. The Trustee argues the settlement was a transfer which, pursuant to Bankruptcy Code § 548(a)(1), was done with the actual intent to hinder, delay, and/or defraud the creditors of Phyllis by relinquishing her interest in the marital property. The Trustee does not argue the divorce was a sham, nor does she argue there was collusion between the parties. Accordingly, the Trustee is not seeking to undo the entire transfer, rather, she only seeks to avoid the agreement to the extent it exceeded a reasonable divorce settlement. The beneficiary of this transfer, Daniel, asserts that no part of the transfer should be undone since he was a good faith transferee, and the transfer was made for "reasonably equivalent value," as the consideration provided by Daniel was his decision not to investigate any hidden assets Phyllis may have had and his forfeiture of any right to pursue future alimony payments from Phyllis.

The bankruptcy code provides trustees with the power to undo certain transactions entered into by debtors prior to filing bankruptcy which were designed to, or had the effect of, frustrating recovery by creditors. 11 U.S.C. § 548 grants the trustee the power to avoid transfers accomplished with either actual or constructive fraudulent intent. Section 548(a)(1)[3] provides that a trustee:

_____

[3]This case was filed prior to the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act, therefore the language here appears as it did before the

> [M]ay avoid any transfer of an interest of the debtor in
> property, or any obligation incurred by the debtor, that was
> made or incurred on or within one year before the date of
> the filing of the petition, if the debtor voluntarily or
> involuntarily–
> (A) made such transfer or incurred such obligation with
> actual intent to hinder, delay, or defraud any entity to which
> the debtor was or became, on or after the date that such
> transfer was made or such obligation incurred, indebted; or
> (B)(I) received less than a reasonably equivalent value in
> exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made
> or such obligation was incurred, or became insolvent as a
> result of such transfer or obligation; . . .

Section 548(a)(1)(A) provides for avoidance of actual fraudulent transfers, while § 548(a)(1)(B)

provides for the avoidance of constructively fraudulent transfers.  The purpose of fraudulent

conveyance law is "to make available to creditors those assets of the debtor that are rightfully a part of

the bankruptcy estate, even if they have been transferred away."  *Buncher Co. v. Official Comm. of

Unsecured Creditors of GenFarm Ltd.*, 229 F.3d 245, 250 (3d Cir.2000); *see also In re Murphy*,

331 B.R. 107 (Bankr.S.D.N.Y.2005).

**Divorce Proceedings as Vehicles for Fraud**

For purposes of § 548, a division of property pursuant to a divorce decree is a "transfer" of

property and therefore may be challenged by a trustee as a fraudulent transfer.  *In re Fordu*, 201 F.3d

693, 702 (6th Cir.1999).  This is true even where the "transfer" is the decision not to exercise a right to

equitable distribution.  *See Fordu*, 201 F.3d at 709 (decision to forgo a claim for equitable distribution

of spouse's lottery winnings and the marital residence was held to be a fraudulent transfer).  Further,

---

amendments.

17

principles of collateral estoppel and res judicata will not apply as creditors are not parties to a divorce

proceeding. *Fordu*, 201 F.3d at 705. As one court noted, "the fact that a transfer occurs in the

context of a divorce proceeding does not immunize such transfer from a § 548 attack by a trustee in

bankruptcy for one of the marital partners." *In re Sorlucco*, 68 B.R. 748, 753 (Bankr.D.N.H.1986).

Courts have found that certain divorce proceedings with unequal divisions of property may be an

attempt to keep assets away from the creditor of one spouse and consequently are open to attack as

actual fraudulent transfers. *See Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995). Where a transfer

of property is made to a spouse by means of a "fast-track" divorce on the eve of bankruptcy, this is

often evidence of a fraudulent scheme to keep property from creditors. *In re Chevrie*, 2001 WL

120132 at *10 (Bankr.N.D.Ill.2001).

Where the divorce does not change the relationship of the parties, but is merely a sham, it is

easy for the court to find that the division of property was a fraudulent transfer. In *In re Boba*, the

court found the divorce to be a sham where the debtor continued to live in the marital residence with

the ex-spouse, and continued to use a vehicle previously transferred to the ex-spouse as part of the

separation agreement. 280 B.R. 430, 434-35 (Bankr.N.D.Ill.2002); *see also In re Chevrie*, 2001

WL 120132 (finding a fraudulent transfer where the debtor and ex-spouse continued to live together

after the divorce, the ex-spouse had no legal representation of her own, and the divorce agreement was

executed shortly before filing for bankruptcy, at a time when creditors were trying to collect on a

judgment).

In other cases, there are situations in which a bona fide divorce exists, but the transferor

nonetheless favors transferring assets to the ex-spouse rather than seeing them go to a creditor body.

18

Although the divorce may be valid, the same may not hold true for the division of marital property.  In *In re Sorlucco*, the court considered an argument by the trustee that the transfer of the martial assets pursuant to a divorce settlement was constructively fraudulent where an equal exchange did not occur. 68 B.R. at 753.   The court determined that Congress' use of the phrase "reasonably equivalent value" did not require an equal exchange, but did require that the exchange be "within the range of likely distribution that would be ordered by the state divorce court if the property division had actually been litigated."  *Id*.  Additionally, the court required the exchange be the result of "arms-length" bargaining. *Id.* at 755.  Applying these standards, the court in *In re Williams* found that while the divorce itself was valid, there was collusion between the parties and the property settlement agreement they reached was fraudulent where the terms where not within the likely range of what a state court judge might order. 159 B.R. 648 (Bankr.D.R.I.1993) (debtor had transferred "virtually the entire marital estate" to the ex-spouse as part of the divorce settlement while he had a present debt to his creditor of $4 to $6 Million. Ex-spouse had no debt and was employed with an starting salary of over $100,000).

Under New Jersey law, title to marital assets is irrelevant.  Once a cause of action for equitable distribution accrues, each party has a claim for equitable distribution of all marital assets no matter whether title is held by one spouse or the other, or jointly.  *Erlanger v. Erlanger*, 364 N.J.Super.449, 451, 836 A.2d 859 (Ch.Div.2003), *citing Tucker v. Tucker*, 121 N.J.Super 539, 545, 298 A.2d 91 (Ch.Div.1972).  Thus, a transfer of a debtor's interest in marital property may be accomplished by an affirmative act, such as giving a deed or a check, or by passively declining to seek equitable distribution of an asset titled in the other spouse (transfer by waiver).

**Burden of Proof**

The burden of proving every element of a voidable transfer rests with the trustee. *Pension Transfer Corp. v. Beneficiaries Under Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003*, 319 B.R. 76, 84-5 (D.Del.2005). Although courts have differed on whether proof of fraudulent intent must be by clear and convincing evidence or a preponderance of the evidence, this court is of the opinion that the proper standard is proof by a preponderance; the parties agree.[4]

Use of this standard is consistent with the Supreme Court's decision in *Grogan v. Garner* where the court held that "[b]ecause the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests are at stake.'" 498 U.S. 279, 286 (1991). With regards to § 548, this court agrees that it "can discern no 'particularly important individual interests or rights' of a transferee in a fraudulent conveyance action that would justify a heightened standard of proof." *In re Am. Way Serv. Corp.*, 229 B.R. 496, 525 (Bankr.S.D.Fla.1999), *citing Grogan*, 498 U.S. at 286; *see also Hechinger Inv. Co. of Del.,* 327 B.R. 537, 550 (D.Del.2005) (holding a fraudulent transfer "can be avoided if plaintiff proves, by a preponderance of the evidence, that the [t]ransaction was either intentionally or constructively fraudulent").

Once the trustee meets this burden of proof, the burden shifts to the defendant to show the that the deal was fair. 11 U.S.C. § 548(c).

---

[4]Initially, Daniel Hill argued the proper standard was proof by clear and convincing evidence. During the proceedings, the court directed the parties to reconsider the relevant burden of proof. Upon further consideration, Daniel agreed the proper standard is preponderance of the evidence.

**Actual Fraud**

To prove an intentionally fraudulent transfer, the burden is on the plaintiff to show the transfer was done "with actual intent to hinder, delay or defraud" creditors. 11 U.S.C § 548(a)(1). It is the intent of the transferor that is at issue, not the transferee. *In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 386 (Bankr.E.D.Pa.1988). The intent of the transferee is only relevant in determining whether the fraudulent transfer can stand based on the transferee's good faith defense under § 548(c). Because actual fraud is rarely proven by direct evidence, as individuals are rarely willing to admit such an intent, courts may infer actual intent by examining the circumstances and considering whether various "badges of fraud" are present. *In re G-I Holdings, Inc*., 313 B.R. 612, 640-41 (Bankr.D.N.J.2004), *citing Gilchinsky v. Nat'l Westminster Bank*, 159 N.J. 463, 477, 732 A.2d 482 (1999). New Jersey's adoption of the Uniform Fraudulent Transfer Act (UFTA) provides a non-exclusive list of factors that should be considered in determining actual intent under state law. N.J.S.A § 25:2-26. Case law developed various factors that evidenced fraud, which were then codified by the UFTA. Since the UFTA and § 548 both examine actual intent to determine the propriety of a transfer, the factors listed under New Jersey's UFTA are equally applicable to § 548. The badges of fraud "'represent circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent.'" *In re G-I Holdings, Inc*., 313 B.R. at 641, *quoting Gilchinsky*, 159 N.J. at 476, 732 A.2d 482.

Courts consider the existence of the following badges in establishing actual intent: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the

transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the

transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed

or concealed assets; (8) the value of the consideration received by the debtor was not reasonably

equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor

was insolvent or become insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the

debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider

of the debtor.  N.J.S.A. § 25:2-26 (1997).

The presence or absence of one factor is not conclusive.  As the New Jersey Supreme Court

explained "[t]he proper inquiry is whether the badges of fraud are present, not whether some factors

are absent.  Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the

transferor's intent, the confluence of several in one transaction generally provides conclusive evidence

of an actual intent to defraud."  *Gilchinsky*, 159 N.J. at 477, 732 A.2d 482; *see also In re Acequia,

Inc.*, 34 F.3d 800, 806 (9th Cir.1994), *citing Max Sugarman Funeral Home, Inc. v. A.D.B.

Investors*, 926 F.2d 1248, 1254-55 (1st Cir.1991) ("The presence of a single badge of fraud may

spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to

defraud").  Additionally, this list is not exclusive.  The court may consider other factors relevant to the

transaction.  *In re G-I Holdings, Inc.*, 313 B.R. at 641.  This court finds the Trustee has proven the

first, third, fourth, eighth, and tenth badges of fraud by the requisite preponderance of the evidence;

taken together, these badges provide conclusive evidence of actual intent to defraud.

As to the first badge of fraud, this court does not find an insider relationship between the

Debtor and her ex-husband, but nevertheless finds an insider relationship exists in the divorce settlement

as the Debtor's daughters benefit from the agreement as well.  The Bankruptcy Code defines the term

"insider," stating in relevant part that the term includes "a relative of the debtor."  11 U.S.C. § 101(31).

The term "relative" is then defined as an "individual related by affinity or consanguinity within the third

degree as determined by the common law..."  11 U.S.C. § 101(45).  A spouse of a debtor would be a

relative because the definition includes relationships by affinity.  A former spouse, however, is not

related by affinity, and therefore "a former spouse will not be considered a relative."  2 *Collier on*

*Bankruptcy* ¶ 101.45 (15th ed. Rev.2006).  The inquiry does not end there however as the definition

of insider is preceded by the non-limiting term "includes."  11 U.S.C. § 101(31); 11 U.S.C. § 102(3).

Therefore, former spouses may be subject to insider status, even though that status is not automatic.

The legislative history of the statute has been adopted by courts as a test for finding insider status, which

states that an insider is "one who has a sufficiently close relationship with a debtor that his conduct is

made subject to closer scrutiny than those dealing at arms length with the debtor."  S.Rep. No. 95-989,

95th Cong., 2nd Sess. 25 (1978) and H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 312 (1977),

reprinted in U.S. Code Cong. & Admin. News, 1978, pp. 5787, 5810, 6269.  In determining the

closeness of the relationship, courts have found the essential question is "the degree to which the

transferee is able to exert control or influence over the debtor."  *In re Dupuis*, 265 B.R. 878, 885

(Bankr.N.D.Ohio 2001), *citing In re Schuman*, 81 B.R. 583, 586 (9th Cir. BAP 1987).  Here, there

is no evidence of Daniel exerting control or influence over the Debtor.  There is no allegation that the

divorce was a sham divorce.  There is nothing to indicate that the parties even maintained an amicable

relationship after separating.   For those reasons, Daniel will not be considered an insider.  However,

23

the daughters of Daniel and the Debtor are insiders to the Debtor.  This is relevant here as the

daughters were also provided for in the divorce proceeding.  The divorce settlement provided that

Daniel would have sole ownership of the marital home, and then, within seven years, the house would

be sold, 50% of the proceeds going to Daniel, and the other 50% divided equally between the parties'

two daughters.

The Trustee has met her burden of proof with regards to the third badge of fraud: the transfer of

martial assets to Daniel was concealed from Phyllis's judgment creditor.  In early March of 2004,

Synergy served Phyllis with a subpoena for a deposition and to produce financial documents on March

24, 2004, so that Synergy could determine the assets of Phyllis in order to collect on its judgment.

Phyllis did not appear and Synergy then filed a motion to enforce its rights on March 29, 2004.  On

April 14, 2004, Phyllis made a settlement proposal to Daniel.  Two days later, on April 16, 2004, a

judgment for divorce was filed and the property settlement agreement was placed on the record.  With

the pending collection efforts of Synergy, Phyllis took steps to ensure the judgment creditor would not

be able to see the terms of the divorce agreement.  The following language was incorporated in the

settlement proposal:

> The Settlement Agreement would not be incorporated into
> the Judgment of Divorce but would be referenced to in the
> Judgment.  The Agreement would be confidential and the
> terms shall not be disclosed to any third party without written
> consent of both parties.
>
> The Husband further agrees that he will not have any direct or
> indirect contact with Synergy Bank, its employees, agents,
> principals, subsidiaries, or affiliates.  The Husband shall not
> disclose any information he may possess to any party that might
> have an interest in the litigation between Synergy Bank and

24

Phyllis.

This language makes clear the Debtor's intent to conceal the transfer, or relinquishments of rights, she

had in the marital assets.  As Synergy got closer to compelling the Debtor's cooperation in disclosing

her finances, Phyllis hastened completion of the divorce settlement and made sure the terms of that

agreement would not be public, and further ensured that her ex-husband would not disclose to Synergy

the terms of that agreement.

Another circumstance tending to prove Phyllis's intent to hinder her creditor, is contained in the

fourth badge of fraud which is a situation in which, before the transfer was made, the debtor was sued

or threatened with suit.  The divorce settlement agreement was placed on the record on April 16, 2004.

Synergy had previously filed a demand for arbitration against Phyllis for her default under the stock

purchase agreement.  An arbitration hearing was conducted and an award was given in favor of

Synergy on September 23, 2003.  Less than four months before the divorce settlement, on December

18, 2003, judgment on the arbitration award was entered in favor of Synergy in the amount of

$164,319.69.  Further, less than three weeks before the judgment for divorce was entered Synergy had

filed its motion to enforce litigant's right against Phyllis for her failure to cooperate in satisfying the

judgment.  These facts are clearly sufficient in proving the existence of the fourth badge of fraud: before

the transfer, or relinquishment of her rights in the marital assets, Phyllis had been sued by Synergy and

found herself facing imminent collection efforts backed by the court's contempt power.

The eight badge of fraud is present when the value of the consideration received by the debtor

is not reasonably equivalent to the value of the asset transferred.  As one court has noted, in the context

of a divorce settlement agreement, this requires a "surface determination" by the court that "the division

of marital property between the divorcing parties was within the range of likely distribution that would

be ordered by the state divorce court if the property division had actually been litigated in that state

court." *In re Sorlucco*, 68 B.R. at 753. Daniel went to great lengths in his response papers to argue

that even if the transfer was done with fraudulent intent, it should nevertheless survive since reasonably

equivalent value had been provided. The Trustee acknowledges that the parties did engage in a bona

fide divorce and Daniel is entitled to a share of the marital assets. But the Trustee argues that the value

of the marital assets received by Daniel from the divorce settlement is grossly disproportionate. Daniel

counters that the division of marital assets was not disproportionate because his relinquishment of the

right to pursue future litigation for assets he believed Phyllis may have been concealing during the

divorce proceedings constituted giving reasonably equivalent value. The value Daniel professes to have

given is illusory.

In exchange for receiving a tax-free lump sum of $150,000 in alimony, Daniel claims he gave

reasonably equivalent value because he waived any right to seek future alimony from Phyllis, and Phyllis

received a one-third interest in his pension plan. The court accepts the opinion of the Trustee's expert

that Daniel would not have received alimony from the family court.[5] In order to prevail on a claim for

alimony, there has to be a showing that the party needs supplemental funds in order to maintain the

parties' marital standard of living. *Crews v. Crews*, 164 N.J. 11, 24-5 (2000) ("The setting of the

marital standard of living is equally important in an uncontested divorce...the court should require the

---

[5]This opinion is based on the fact that Daniel was a long-term employee of the United States
Postal Service, receiving an annual income in excess of $80,000; the parities lived separately since
December, 1999; Daniel purchased investment properties and made the mortgage payments on the
properties; and he maintained a savings plan.

parties to place on the record the basis for the alimony award including, in pertinent part, establishment of the marital standard of living."). Here, Mr. and Mrs. Hill were separated since December 1999, and both parties assumed the responsibility of their own finances with no support from each other. The standard of living Daniel enjoyed while self-supported is the same standard of living he enjoyed while the parties were together. Daniel has maintained a standard of living that is at least as comfortable as that which was enjoyed during the marriage; alimony, therefore, is not necessary to achieving the standard of living enjoyed during the marriage.

Further, in his original settlement proposal to the Early Settlement Panel, Daniel did not seek any alimony. Phyllis was the only party who sought alimony and, as a result of this divorce agreement, she ended up being the one paying alimony. Additionally, for Daniel to argue reasonably equivalent value was exchanged for the alimony since Phyllis received a one-third interest in his pension plan is also disingenuous since Phyllis would likely have been entitled to the one-half interest she originally sought.

With regards to the various pieces of real property, Daniel again received a disproportionate amount of the properties, consideration for which was not roughly equivalent. Daniel received sole ownership of the marital home with the agreement that it would be sold in seven years with 50% of the proceeds going to Daniel and the other 50% of the proceeds being split between the parties' two daughters, leaving Phyllis with no interest in the marital home.

Daniel also received a 100% interest in both the Jackson 1 property and the Jackson 2 property. Both of these properties were purchased by Daniel during the marriage and before the parties separated, with the money coming from the refinance of the marital home. Phyllis originally

27

sought to have the properties split in-kind, with each party to receive a 100% interest in one or the other of the properties, but as a result of the settlement agreement, Phyllis received no interest in either property.  Daniel contends that reasonably equivalent value was given as Phyllis received ownership of two other properties.  Phyllis did receive a 100% interest in both the Manalapan property and the Florida property.  However, both of these residences were purchased by Phyllis with her own funds after the parties separated.  Further, the net proceeds from the Florida property were used, almost entirely, to make the $150,000 lump-sum alimony payment to Daniel.  The division of property was not within the "likely distribution" that would have been ordered as part of an equitable distribution determined by a state court.  *See In re Sorlucco*, 68 B.R. at 753.

The tenth badge of fraud, a transfer occurring shortly after a substantial debt was incurred, is also present, proven by facts similar to those addressed with regards to the fourth badge of fraud. Synergy brought suit and received a judgment against Phyllis before the divorce agreement was executed.  The resulting arbitration award created a substantial debt against Phyllis in the amount of $164,319.69.  Judgment was entered on the arbitration award by order dated December 18, 2003. Four months later, in April 2004, Phyllis had submitted and executed a divorce settlement proposal with Daniel, abandoning her interest in a substantial amount of the marital property, causing that money to be unavailable to her judgment creditor.

The court is satisfied that proof of these five badges, taken together, is conclusive evidence of an actual intent to defraud creditors.  Additionally, the court has considered several other circumstances that support a finding of actual intent to defraud.  First, shortly after Phyllis started her own business, she transferred her interest in the marital residence to Daniel in a deed dated August 26, 1997,

28

recorded September 16, 1997.  Phyllis testified this transfer was done to protect the residence from her

potential business creditors.  Additionally, shortly after filing for divorce, Phyllis transferred her

Manalapan residence to her daughter, leased it back and continued to reside in that home.  This is

another attempt by Phyllis to relinquish her ownership interest in order to keep assets from interested

parties.  The court is also cognizant of the timing of the collection efforts, the divorce settlement, and the

bankruptcy filing.  Although the parties had been separated since 1999, it was not until the judgment

creditor secured a judgment in its favor along with an order to compel Phyllis's cooperation by threat of

contempt, that the divorce proceedings were finally resolved.  Finally, during her trial testimony, Phyllis

was questioned about the agreement whereby Daniel would get sole ownership of the marital property,

the proceeds from which would also benefit their daughters.  In response to the questioning, to

paraphrase, Phyllis stated: "If I couldn't keep it, I might as well let my daughters have it."  This

statement certainly supports a determination that Phyllis did not want to see her property going to her

judgment creditor and was transferring away her interest to prevent collection efforts by Synergy.

The Trustee has met her burden of proving actual fraudulent intent under § 548(a)(1)(A).

Therefore, this court need not determine whether the elements of a constructive fraudulent conveyance

are also present.  The transfer is subject to avoidance by the Trustee provided the transferee cannot

assert a defense.

**Good Faith Defense**

In order to successfully assert a good faith defense under § 548(c), the burden shifts to the

defendant/transferee.  *American Way*, 229 B.R. at 525.  Section 548(c) provides, in pertinent part:

Except to the extent that a transfer or obligation voidable

29

under this section is voidable under section 544, 545, or
547 of this title, a transferee. . .that *takes for value and in
good faith* has a lien on or may retain any interest
transferred. . .to the extent such transferee or obligee gave
value to the debtor in exchange for such transfer or
obligation.

11 U.S.C. § 548(c) (emphasis added).  Utilization of this defense requires proof of two elements: "first,

innocence on the part of the transferee, and second, an exchange of value."  *In re Burry*, 309 B.R.

130, 135 (Bankr.E.D.Pa.2004)*; see 5 Collier on Bankruptcy* ¶ 548.07 (15th ed. Rev.2006) ("so

long as the transferee's 'only liability to the trustee is under this section, and he takes for value and in

good faith,' subsection (c) protects the transfer") (citations omitted).

In evaluating the innocence, or good faith, of the transferee, the court takes an objective

approach to determine what the transferee knew or should have known "such that a transferee does not

act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the

transfer."  *Burry*, 309 B.R. at 136, *citing In re Sherman*, 67 F.3d. 1348, 1355 (8th Cir.1995).  Here,

Daniel has failed to meet his burden in establishing his good faith.  Daniel knew, or should have known,

that Phyllis's transfer of assets through the divorce settlement agreement was done with fraudulent

intent.  Daniel was given no logical explanation as to why Phyllis suddenly changed her position and

decided not to pursue the marital division of property she previously demanded.  The significant change

in position and grossly uneven distribution of marital assets was enough to put Daniel on notice that

Phyllis was intending to divest herself of assets.  As early as November, 2003, Daniel knew of the

arbitration award entered against Phyllis.  In a handwritten letter from his own attorney, Daniel was

advised of the award.  At a deposition on February 12, 2004, Daniel's attorney questioned Phyllis

30

extensively about the judgment against her and her contemplation of bankruptcy. Phyllis's overly-generous proposal came one day after Daniel's lawyer subpoenaed the judgment creditor, Synergy. Further, and probably the most telling example of Daniel's knowledge of Phyllis's fraudulent intent is his knowledge of the language in the settlement proposal that references Phyllis's judgment creditor:

> The Husband further agrees that he will not have any direct or indirect contact with Synergy Bank, its employees, agents, principals, subsidiaries, or affiliates. The Husband shall not disclose any information he may possess to any party that might have an interest in the litigation between Synergy Bank and Phyllis.

In light of all these circumstances, Daniel cannot claim that he had no knowledge, or at least sufficient knowledge to place him on inquiry notice, of Phyllis's intent to keep her assets away from a judgment creditor. Therefore, Daniel cannot satisfy the good faith prong of a § 548(c) defense. Having failed to satisfy this first requirement, the court need not consider this defense further, nevertheless, we briefly turn to the second prong.

The second requirement to establishing a § 548(c) defense is for the transferee to prove an exchange for value. While the Third Circuit has not yet defined "value" in this context, this court is persuaded that the standard should be reasonably equivalent value. *Burry*, 309 B.R. at 136 ("This makes sense given that the definition of value, the term reasonably equivalent value and the good faith defense requiring a tender of value all appear in the same Code section"); *citing In re Hannover Corp.*, 310 F.3d 796, 801 (5th Cir.2002). The *Hannover* court explained that in connection with § 548(c), the relevant inquiry is the value given by the transferee, rather than the value received by the debtor as would be examined under § 548(a)(1)(B)(I). *Hannover*, 310 F.3d at 802. Section 548(c),

"[i]nstead of inquiring into the possibility and extent of the debtor's loss, [] provides a means by which the unwitting trading partner can protect himself...Received property can be retained 'to the extent' that the 'transferee ... gave value to the debtor.'  The provision looks at value from the perspective of the transferee." *Id.*  The issue of reasonably equivalent value received by the Debtor was discussed previously in connection with the eighth badge of fraud and § 548(a)(1)(B)(I).  As part of that discussion, it was also evident that Daniel, the transferee, did not provide reasonably equivalent value in distribution of the marital property.  Daniel received more than an equitable share of the marital property while providing nothing of additional value in return.  While Daniel claims his decision not to pursue future litigation for additional assets was the value given, this court has already determined that this "value" was illusory.  Daniel has not met his burden of proof with regards to either prong of a § 548(c) defense.  Furthermore, the value that Daniel gave was his claim for equitable distribution.  The Trustee seeks, and the court will award, an avoidance of the transfers only to the extent they exceeded a reasonable equitable distribution.  The result will leave Daniel with the full value of his equitable distribution claim so he will retain what he contributed to the settlement.

**Remedy**

Under 11 U.S.C. § 550(a), to the extent that a transfer is avoided under § 548, the trustee can recover the property or the value of the transferred property.  In pertinent part, this section provides:

> (a) Except as otherwise provided in this section, to the
> extent that a transfer is avoided. . . the trustee may recover,
> for the benefit of the estate, the property transferred, or, if
> the court so orders, the value of such property, from–
> (1) the initial transferee of such transfer...

11 U.S.C. § 550.  The purpose of this section is "to restore the estate to the financial conditional it

would have enjoyed if the transfer had not occurred." *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr.S.D.N.Y.1998) (citations omitted); *see also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd.*, 229 F.3d 245, 250 (3d Cir.2000). The entire transfer need not be undone. *In re Murphy*, 331 B.R. 107, 122 (Bankr.S.D.N.Y.2005). A fraudulent transfer should be avoided only to the extent creditors were harmed. *Murphy*, 221 B.R. at 122 (protecting creditors from the effects of fraudulent transfers can be accomplished by "limiting the measure of avoidance damages under Sections 548 and 550 to the amount necessary to make creditors of the debtor's estate whole"). In this way, creditors are protected while debtors are still held to the terms of the agreement they made with a transferee. *Id.* at 123.

Here, there is no contention that this is not a bona fide divorce. The Trustee does not deny that as part of this divorce, the parties were entitled to enter into a property settlement agreement. However, the Trustee has shown the settlement was an inequitable distribution. To the extent this agreement was used to transfer away Phyllis's right to the marital assets in an attempt to deny recovery by her judgment creditor, the agreement can be avoided.

The Trustee requests, as a remedy regarding the real property, an avoidance of the transfer of Phyllis's equitable distribution claim. Then the Trustee would have this court effect an equitable distribution by awarding the Trustee a percentage interest in the Howell residence, Jackson 1, and Jackson 2. The Trustee also seeks a refund of the $150,000 lump sum alimony payment. (The pension is discussed below).

The court has discretion under § 550 to order a reconveyance of the transferred property or the value of the property. *Morris v. Kansas Drywall Supply Co., (In re Classic Drywall, Inc.)*, 127

33

B.R. 874 (Bankr.D.Kan.1991). Case law has developed a number of factors to consider in

determining whether to order a recovery of the property or its value. *Official Comm. of Asbestos*

*Claimants v. Builders Materials Corp. of Am. (In re G-I Holdings, Inc.)*, 338 B.R. 232

(Bankr.D.N.J.2006). In this case, there are many factors that caused the court to choose a money

judgment over recovery of the property.

The three parcels of real estate still owned by Daniel were titled in his name at the start of the

matrimonial case. The transfer by Phyllis was her claim for equitable distribution - a transfer by waiver.

Merely setting aside the transfer would restore to the bankruptcy estate Phyllis's claim for equitable

distribution. This court would then have to decide whether to award the Trustee a percentage interest

in the property. Following that, the Trustee would have to sell the real estate and Daniel's interest

under §§ 363(b) and (h) of the Bankruptcy Code. As the Trustee concedes in her brief, this could

involve further litigation and expense. Additionally, it might be necessary to account for costs of

preservation, payment of liens, improvements, and increases in value under § 550(e).

The value of the real estate and the net equity as of the divorce are all well known since the real

estate was appraised and loan statements obtained for the matrimonial action. Phyllis sold her real

estate during the pendency of the divorce case so the net values of those assets are known. There

were also retirement savings accounts to be equitably distributed. Rather than attempt a reconciliation

of all these factors and risk further litigation and complications, it is simpler to calculate the value of the

excess amount given to Daniel in the equitable distribution settlement and award a money judgment to

the Trustee for that amount.

Since there was a bona fide divorce and Daniel was entitled to his share of the marital property,

34

there was consideration given even though the consideration was not sufficient.  The damages therefore

will be the difference in distribution between the property settlement agreement and a reasonable

equitable distribution.   This remedy is consistent with the mandates of § 550: "[c]ourts generally agree

that the market value of the property at the time of transfer, less consideration received, is the proper

measure of recovery under § 550." *In re Colonial Realty Co.*, 226 B.R. 513, 525

(Bankr.D.Conn.1998).

Daniel's proposal to the ESP, excluding the pension, was at the far range of what could be a

reasonable settlement.  Certainly to the extent the value of property received by Daniel exceed his own

settlement proposal it was excessive.  Daniel must have anticipated a compromise at something less

than his initial offer and expected to receive less if the matter were litigated.  Likewise, Phyllis's

proposal to the ESP was on the low end of reasonableness and Daniel could have expected more in

negotiation or litigation.  Mr. Cheifetz's opinion as to Daniel's share is probably the worst that Daniel

could expect in litigation.  Also, the court feels that Mr. Cheifetz failed to give Daniel sufficient creditor

for satisfying mortgages on Jackson 1 and Jackson 2.  Giving Daniel somewhat of the benefit of any

doubt, the court finds that an equal division of marital assets is the most appropriate benchmark for

determining an equitable distribution.  Referring to the chart above, the Trustee is entitled to the excess

of the value of property allocated to Daniel in the settlement ($660,000) over an equal division of

property ($445,000).  Under § 550, the Trustee may recover the difference: $215,000.

**Pension**

In her trial brief, the Trustee argues that Phyllis was entitled to 50% of the marital portion of

Daniel's USPS pension and that by accepting only 33%, Phyllis fraudulently conveyed 17% of the

marital portion of the pension.  This, again, is a transfer by waiver.  The Trustee promised that her

family law expert would opine that Phyllis "was entitled to 50% of the marital portion of [Daniel's]

pension instead of the 33% she actually received - a difference of 17%."  Further, the Trustee's brief

previewed expert testimony from a pension evaluator that "33% of the present cash value of marital

benefit (what the Debtor actually received in the divorce action) is valued at $194,973.78, and 50% of

the present cash value of marital benefit (what the Debtor should have received in the divorce action

according to [the Trustee's] matrimonial expert) is valued at $295,414.82.  Plaintiff will demonstrate

that Debtor fraudulently transferred her right to $100,441.04, representing the 17% difference of the

marital portion of [Daniel's] pension to which she was entitled."  As a remedy under § 550 of the

Bankruptcy Code, the Trustee seeks the value of 17% of the pension, $100,441.04.

There are several problems with the Trustee's theory and proofs.  First of all, Daniel's pension

under the civil service retirement statute is exempt from legal process.  5 U.S.C. § 8346(a).  An

exception to this rule is that payments may be made to a former spouse pursuant to a family court

order.  5 U.S.C. § 8345(j).  Phyllis's creditors could not levy upon, nor sell, her right to receive

benefits.  Her 33% interest in Daniel's pension is excluded from property of the bankruptcy estate.  11

U.S.C. § 541(c)(2).  *In re Seddon*, 225 B.R. 815 (Bankr.W.D.N.C.2000).  Thus, whether Phyllis's

claim for equitable distribution of Daniel's pension was fixed at 50% or even 100%, it would not have

yielded an asset that the Trustee could liquidate for the benefit of creditors.  Her acceptance of 33%

36

has not harmed her creditors, nor diminished her bankruptcy estate.  The purpose of fraudulent

conveyance law is "to make available to creditors those assets of the debtor that are rightfully a part of

the bankruptcy estate, even if they have been transferred away."  *Buncher Co. v. Official Comm. of*

*Unsecured Creditors*, 229 F.3d 245, 250 (3d Cir.2000).  Even accepting the Trustee's theory that

Phyllis transferred a 17% interest in Daniel's pension that should have been hers in equitable

distribution, avoiding that transfer would not make any assets available for creditors.  There is no

reason to disturb Daniel's settlement with Phyllis regarding his pension where the purpose of the

fraudulent conveyance statute will not be fulfilled.

Secondly, the expert testimony by Mr. Cheifetz was not exactly as the Trustee predicted.  Mr.

Cheifetz explained that equitable distribution of pensions can be accomplished in two ways: (1)

allocating percentages to each spouse "as and when" the pension is paid out, ("deferred distribution");

or (2) the immediate offset method in which cash is given to the non-employee spouse immediately in

lieu of any future right to the pension.  The New Jersey Supreme Court explained these concepts and

their pros and cons in detail in *Moore v. Moore*, 553 A.2d 20 (1989).  The court wrote: "we

encourage use of the 'immediate payment' approach.  We recognize, however, that in some instances

the 'deferred distribution' or 'partial deferred distribution' approach will be appropriate.  Courts must

decide which to use based on sometimes competing considerations: the elimination of strife between the

parties, the ease with which the present value of the pension may be ascertained, and the ability of the

employee spouse to pay the non-employee the current cash value of the pension."

Mr. Cheifetz testified that if the immediate offset method were employed, Phyllis would not be

allocated 50% of the present value of the marital portion of Daniel's pension, but a lesser percentage to

37

account for the theoretical ability of the non-employee spouse to invest the lump-sum and other factors.

In Mr. Cheifetz's opinion, Phyllis would have most likely been awarded 1/3 of the present value of the

marital portion of Daniel's pension in an immediate offset equitable distribution.  Referring to the

pension evaluator's report prepared in connection with the Family Court case, Mr. Cheifetz calculated

that amount as $175,776.85.

He then opined that if a deferred distribution method for equitable distribution were employed,

Phyllis would receive 50% of the marital portion of Daniel's pension, as and when received.  In Mr.

Cheifetz's opinion, Phyllis accepted less of Daniel's pension than that to which she was entitled.  To

calculate how much less, one would have to compare: (a) a likely immediate offset award of 1/3 of the

present value of the marital portion ($175,776.85) with (b) 50% of a deferred distribution of the

pension as and when received, but reduced to a present value.  Mr. Cheifetz was unable to perform

part (b) of that calculation from the information provided in the pension evaluator's report.  The

Trustee's counsel promised to provide further expert testimony from the pension evaluator in that

regard, but never did.

In lieu of expert testimony from the pension evaluator, the parties stipulated that his updated

report, dated September 29, 2005, could be admitted into evidence as Plaintiff's exhibit #110.  The

parties further stipulated that the present cash value of the marital portion of the pension for purposes of

the bankruptcy case would be the mid-point between the amount in the expert's report in the

matrimonial proceeding ($576,330.56) and the amount in his September 29, 2005 report

($590,829.63).

The problem is that the pension evaluator's September 29, 2005 report does not provide the

38

calculation that Mr. Cheifetz testified was needed, but that he was unable to do. That is, 50% of the

pension benefit as and when received, but reduced to present value. Likewise, the court is unable to

find in the record the evidence to complete the damage calculation as opined by the Trustee's

matrimonial law expert.

As stated above, the Trustee's trial brief asserted that she should recover 17% of the present

cash value of the marital portion of Daniel's pension. She promised that her pension evaluator would

provide evidence that "33% of the present cash value of marital benefit (what the Debtor actually

received in the divorce action) is valued at $194,973.78 and 50% of the cash value of marital benefit

(what the Debtor should have received in the divorce action according to Plaintiff's matrimonial expert)

is valued at $295,414.82. Plaintiff will demonstrate that Debtor fraudulently transferred her right to

$100,441.04, representing the 17% difference of the marital portion of Defendant's pension to which

she was entitled." However, the Trustee's matrimonial expert testified that in an immediate offset

method, Phyllis would only receive property equal to 1/3 of the present value of the marital portion of

the pension (not 50% as posited in the Trustee's brief). Furthermore, Mr. Cheifetz testified that the

shortfall in what Phyllis received should be measured differently than argued in the Trustee's brief and

there is incomplete evidence to make that calculation. The court is not convinced that Mr. Cheifetz

accurately stated the correct measure of damages in any event. The court would expect the damages

to be the difference between what Phyllis should have received (1/3 of the present value of the marital

portion of the pension, in an immediate offset) versus what Phyllis actually received (1/3 of the marital

portion of the pension as and when received), reducing the later to present value.[6]   Mr. Cheifetz

opined that the damages be measured by comparing what Phyllis should have received in immediate

offset against what she should have received in a deferred distribution.  Not only is this mixing apples

and oranges, it does not take into account what Phyllis actually accepted- 1/3 of a deferred distribution.

Lastly, the court is not convinced that the Family Court would have employed the immediate

offset method in this case.  In *Moore v. Moore*, the New Jersey Supreme Court explained the factors

to consider in determining whether to use the preferred immediate offset method versus the deferred

distribution method.  One of the factors is the value of the pension as compared to the other assets.

Here, Daniel's pension, earned during a long marriage, was by far the most valuable marital asset with a

present value stipulated at $583,580.05.  In addition, Daniel is eligible to retire within a short time.  He

was almost 52 years old at the time of divorce and had over 30 years of service with USPS.  He could

retire at age 55.  5 U.S.C. § 8336(a).  It is questionable whether a court would force Daniel to

liquidate other assets to buy out Phyllis's interest in this large, contingent asset, especially when he is so

close to retirement.  On cross examination, Mr. Cheifetz conceded that immediate offset of a pension is

not required and might well not be ordered under these circumstances.

## CONCLUSION

The divorce settlement agreement that was executed between Debtor, Phyllis, and her then

estranged husband, Daniel, was a transfer done with the actual intent to hinder, delay, and defraud her

---

[6]One would suppose that 1/3 of the matrimonial portion of the pension, as and when received, reduced to present value, would be the same as 1/3 of the present value of the marital portion of the pension.  Mr. Cheifetz testified that it is not, and the will accept his expert testimony.  If, on the other hand, the supposition is correct, then, by Mr. Cheifetz's formula, the damages equal zero.

judgment creditor.  Pursuant to § 548(a), the Trustee has the power to avoid this transaction to the

extent it harmed the creditor.  The Trustee may recover the value of the transfer, $215,000.


Dated: May 9, 2006                                   __/S/ *Raymond T. Lyons*_____
                                                     Raymond T. Lyons, U.S.B.J.